Argued December 15, 1977, affirmed March 1, reconsideration denied April 12, petition for review denied September 6, 1978

SMITH, *Appellant,*
*v.*
LEW WILLIAMS CADILLAC, *Respondent.*
(No. A 77 07 10651, CA 9260)
575 P2d 669

Dan O'Leary, Portland, argued the cause for appellant. With him on the brief was Pozzi, Wilson, Atchison, Kahn & O'Leary, Portland.

G. Howard Cliff, Portland, argued the cause and filed the brief for respondent.

Before Schwab, Chief Judge, and Thornton and Joseph, Judges.

THORNTON, J.

## THORNTON, J.

Claimant filed a claim alleging that he contracted an occupational disease as defined in ORS 656.802 (1)(a)[1]. The referee found that claimant had suffered a compensable occupational disease involving his lungs. The Workers' Compensation Board reversed, finding that the claimant had not sustained his burden of proof. The circuit court affirmed the Board and claimant appealed.

■ The only issue on appeal is whether claimant's physical condition is causally related to his employment as an automobile spray painter, an occupation he performed for over 25 years. The resolution of this question lies outside the scope of lay persons' knowledge and must be left to expert medical opinion, which the trier of fact must weigh and consider. *Iverson v. SAIF,* 28 Or App 789, 561 P2d 651 (1977).

■ Dr. Eugene Kazmierski, an internist who was claimant's treating physician, began seeing claimant in 1971 for general care. In September 1975 claimant's x-rays disclosed fuzzy nodular areas that were diagnosed by Dr. John W. Loomis, a radiologist, as "* * * [lying] between healed tuberculosis or other granulomatous disease, and siderosis or pneumoconiosis, possibly disease due to chronic inhalation of dust as in Farmer's lung." Although claimant's condition was asymptomatic, Dr. Kazmierski encouraged claimant to discontinue his employment as a spray painter, which he did on October 23, 1975. Dr. Kazmierski indicated that he felt claimant's condition might be an allergic response to chronic inhalation of chemical agents in the spray paint, but he did not rule out sarcoidosis, a disease of unknown etiology.

---

[1]ORS 656.802(1)(a) provides:

"(1) As used in ORS 656.802 to 656.824, 'occupational disease' means:

"(a) Any disease or infection which arises out of and in the scope of the employment, and to which an employe is not ordinarily subjected or exposed other than during a period of regular actual employment therein."

[ 23 ]

At the hearing before the referee Dr. Kazmierski testified that claimant was suffering from nodular pulmonary fibrosis, most likely talc pneumoconiosis. He attributed claimant's disease to the presence of talc in the air at claimant's place of employment resulting from sanding of body filler plastic. He said, however, other chemicals may be involved as well.

Dr. John Tuhy, a specialist in respiratory diseases, testified on behalf of the employer. He examined claimant on one occasion. He also found claimant to be asymptomatic with no breathing difficulties. He examined claimant's x-rays dating back to 1959 and concluded that claimant's condition had begun developing as early as 1965. Dr. Tuhy disagreed with Dr. Kazmierski's diagnosis and indicated that he felt claimant was suffering from sarcoidosis. He ruled out talc pneumoconiosis because a person with that disease suffers shortness of breath, coughing, striking x-ray changes and poor breathing tests, none of which was present in this case. Dr. Tuhy did note, however, that he might agree with Dr. Kazmierski if there was evidence that claimant ingested substantial quantities of talc.

The only evidence of talc present in claimant's work environment was the affidavits of an employe of claimant's attorney's office who contacted representatives of firms making body filler plastic. These representatives stated that talc comprised 50 to 60 percent of their products. Even assuming that this evidence was admissible, there is still no evidence that claimant was exposed to sufficient quantities of talc dust to cause the disease. In fact, contrary to claimant's testimony, two co-workers testified that the painters were not involved in sanding down the body filler. This function was performed in the body shop. Claimant's doctor did not point to other specific chemical agents that might cause the condition, and Dr. Tuhy indicated that he knew of no cases where auto spray painters contracted respiratory diseases associated with their work.

[ 24 ]

We agree with the Board that claimant has not met his burden of proving by a preponderance of the evidence that his condition is causally related to his occupation or environment and, therefore, the claim was properly denied.

Affirmed.

**JOSEPH, J.,** dissenting opinion.

I disagree with the majority in two respects, one of which is comparatively minor.

The minor point arises out of the statement that the issue of the causal relationship of claimant's condition to his employment "lies outside the scope of lay persons' knowledge and must be left to expert medical opinion, which the trier of fact must weigh and consider." 33 Or App at 23. Implicit in the statement is that the issue is to be determined *solely* by a battle of experts. I believe that the trier of fact is entitled to consider any relevant and competent evidence on the question, whether it comes entirely from experts or, as in this instance, partly from the claimant himself. *Uris v. Compensation Department,* 247 Or 420, 427 P2d 753, 430 P2d 861 (1967).

The second and more substantive point requires a review of the evidence.

Claimant testified that he had been a spray painter since 1947. He said that he worked in a semi-closed area, ventilated only by two floor fans. When cars came into the paint shop, they often had heavy amounts of dust which had been produced by the body shop in sanding body filler. That dust had to be removed with an air hose. The filler often also had to be given more sanding. Then the auto was sprayed with three or four coats of primer. After priming, it was sanded again and the paint applied. Claimant testified that the dust, fumes and "overspray" were often so thick that the atmosphere in his work area was "hazy." He said body filler plastic had been in use

for 16 or 17 years. He usually wore one of the two protective masks he had been issued but sometimes he did not wear a mask while in his work area. He also testified that he had not worked at other trades in which he would have been exposed to other respiratory irritants, e.g., he had never worked in a mine or on a farm.

Dr. Kazmierski, claimant's physician, testified that it was his opinion, based upon reasonable medical probability, and assuming there was dust, paint spray and paint thinner in the air where claimant worked, that claimant's work environment was a material contributing factor to his disease, or at least to its acceleration or aggravation, because he felt that the inhalation of some irritant in the air over the course of many years was the most likely source of claimant's lung condition. He said that talc inhalation was the most likely agent, but he did not exclude other possibilities and accepted the possibility that causation had been a combination of several agents. He diagnosed claimant's condition as nodular pulmonary fibrosis and ruled out sarcoidosis.[1] On cross-examination he said that he had long believed that inhalation of spray paints was a "leading possibility" in causing claimant's problem. He said that talc pneumoconiosis[2] develops over a long period of time, and symptoms may not appear until after many years of exposure.

Dr. Tuhy, for the employer, testified that in his opinion claimant's x-rays could best be explained as sarcoidosis, the cause of which is unknown. He denied the possibility that the condition was job-related, but his reasons for doing that were not altogether clear. In

[1] A tumor resembling a sarcoma. Stedman's Medical Dictionary (2d Lawyers' ed 1966).

[2] Definition:

"a. Fibrous induration of the lungs * * * due to the inhalation of talc-laden dust occurring in workers in the grinding and preparation of talc or in those whose occupation * * * entails the use of powdered talc." Stedman's Medical Dictionary (2d Lawyers' ed 1966).

[ 26 ]

part, it was because he had never had experience with or read of a spray painter developing such a condition. On cross-examination he agreed that the radiographic appearance of talcosis (i.e., talc pneumoconiosis) could be the same as sarcoidosis. He also testified that he had not considered the possibility of talcosis before the hearing and might be caused to change his opinion if it were shown that claimant had been exposed to large quantities of talc. He also said that he was aware from the medical literature that many types of paints use talc as a filler.[3]

The referee found Dr. Kazmierski the more credible of the medical witnesses and awarded compensation. My review of the record, accepting the claimant and the two doctors as equally credible, persuades me that the claimant proved his entitlement to compensation by a preponderance of the evidence.

There are no Oregon cases which deal directly with the issue of proof in cases such as this. Several "inhalation" cases have been reported but they dealt with other issues. Two cases are, however, instructive, although they conflict in result. In *Williams v. SAIF,* 22 Or App 350, 539 P2d 162 (1975), the claimant attributed his undisputed hearing loss to the noise level at the place where he had worked for several years. The court noted that the only evidence concerning the noise level was claimant's own testimony and that the only evidence linking the hearing loss to the noise level was the testimony of a medical witness that the hearing loss was "compatible with" noise exposure. The claimant there had had a slight hearing loss before he began employment. We held that, given the absence of any evidence except his own on causation, he had failed to establish a causal relationship between the hearing loss and the employment.

---

[3] Claimant did not succeed in getting into the record evidence that the body filler used where the claimant worked, or body filler in general, contains talc.

[ 27 ]

In *Volk v. Birdseye Division,* 16 Or App 349, 518 P2d 672 (1974), claimant was working on an assembly line when a piece of broccoli covered with a white powder of unknown nature or some broccoli juice got into her eye. Shortly thereafter she developed uveitis.[4] Although the medical experts testified that the disease was of unknown etiology, they concluded from the common-sense relationship between the broccoli incident and the eye condition which developed directly thereafter that there was a causal connection. The claimant was awarded compensation.

Obviously the claim in this case is distinguishable from the single incident in *Volk,* but I believe that common sense compels an award in this case too. Claimant had worked at the painting trade for many years. His testimony substantially eliminated possible sources of inhaled irritants outside that job, and it also furnished well nigh conclusive evidence that there were dust, fumes and spray paint in his work atmosphere. This is not to say that expert medical testimony was not required. There was expert testimony that the most likely cause of claimant's condition was the inhalation of some noxious substance over a long period of time. Dr. Kazmierski mentioned spray paint as one possibility, and he was very definite that the claimant's condition was due to the inhalation over a long period of time of one or more substances, although he could not specify what the substances were.

There seem to be only two possible reasons for denying compensation. The first could be that the employer's medical testimony was the more convincing. Dr. Tuhy testified that he felt claimant's condition was due to sarcoidosis and he could not attribute that condition to the job because the origin of the disease, the causative origin of the disease, is unknown. I hardly find it convincing that the claimant's condition

---

[4] "Inflammation of the entire uveal tract * * *" Stedman's Medical Dictionary (2d Lawyers' ed 1966).

should be found to be not work-related because it is a condition for which science has not yet determined the precise cause. Dr. Tuhy testified clearly that the condition was not work-related, but the record does not show any clear basis for that opinion. I do not read the testmony as excluding possibility that sarcoidosis could be caused by the irritants to which the claimant was in fact exposed. Even if talcosis was not proved, it still does not do to say that claimant had failed to bear his burden of proof, for his case was not based solely upon proving that particular disease.

The second reason for denying compensation might be that because Dr. Kazmierski was not specific as to the particular inhaled agent or agents that caused claimant's disease, the burden of proof was not met. I do not think the law requires that in every instance a claimant must prove that he is suffering from a specific condition caused by specific irritants. It should be sufficient in cases like this for the claimant to show, by whatever means, the conditions of exposure and by medical testimony that the condition is a probable result of the exposure, assuming that the claimant also establishes to the satisfaction of the trier of fact the absence of equally probable causes. *See King v. Oregon Steel Mills,* 25 Or App 685, 550 P2d 747 (1976), where the conclusion that claimant's condition was work-related was supported by the exclusion of other possible causes and improvement in his condition after leaving the job which was alleged to have produced it. To require more would impose a burden on sick workers which is contrary to the spirit of the Occupational Disease Law.

I would hold on this de novo review that the claimant did establish by a preponderance of the evidence his entitlement to compensation. Therefore I dissent.